**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                *Plaintiff-Appellee,*

v.

EFRAIN BECERRA-GARCIA,
                *Defendant-Appellant.*

No. 03-10654

D.C. No.
CR-02-00062-RCC-
BPV

OPINION

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted
October 5, 2004—San Francisco, California

Filed February 2, 2005

Before: Thomas J. Meskill,* Stephen S. Trott, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

---

*The Honorable Thomas J. Meskill, Senior United States Circuit Judge
for the Second Circuit Court of Appeals, sitting by designation.

## COUNSEL

Lee Tucker, Tucson, Arizona, for the defendant-appellant.

Erik J. Markovich, Assistant United States Attorney, Tucson, Arizona, for the plaintiff-appellee.

## OPINION

McKEOWN, Circuit Judge

Efrain Becerra-Garcia challenges the district court's denial of his motion to suppress evidence, namely the discovery by tribal rangers of illegal aliens in his van while crossing the Tohono O'odham Nation. Although the scope of the rangers' authority and the location of the stop on reservation land inform our analysis, this case boils down to a determination whether the rangers' stop of Becerra-Garcia was reasonable. We conclude that it was and thus affirm.

### BACKGROUND

The setting of this case is the Tohono O'odham Indian Reservation, which covers a sprawling 90 miles across southern Arizona. The Tohono O'odham Police Department includes a division of tribal rangers, officers who have less power than fully-authorized tribal police officers. The rangers are authorized to patrol the reservation and report suspicious activity to tribal police officers or the United States Border Patrol. According to the testimony of two rangers and a tribal police officer, rangers do not have authority to stop suspicious vehicles. Vehicles that stop voluntarily may be detained until the arrival of officials who have authority to arrest. If a suspicious vehicle does not voluntarily stop and instead exits tribal land, the rangers must let the car go. A ranger may make an arrest at the direction of a tribal police officer. Thus, the rangers' primary duties are to patrol, looking for suspicious activity, to report to the police department and other authorities (usually the Border Patrol), and to detain suspects who voluntarily stop.

Tribal Rangers Andrew Ruiz and Denver Calabaza were patrolling on a remote dirt road on the reservation when they saw a van heading north. They were about twenty miles from the nearest highway and three miles from the nearest village,

Queens Wells. The tribal police department had, in the preceding weeks, received complaints of unidentified vehicles driving through the area. Because trespassing is a significant problem and only local ranchers typically use the roads in this vicinity, the rangers make a practice of calling in the license plate numbers for all unknown vehicles transiting that area. The rangers did not recognize the van, which did not have a reservation license plate, and, in keeping with their standard practice, they followed it in order to report the license plate number. When the rangers turned on their emergency hazard lights, the van stopped.

Almost immediately after the van stopped, the driver, Becerra-Garcia, got out and walked toward the rangers, leaving the van door open. Both of the rangers had already stepped out of their jeep. Ranger Calabaza asked Becerra-Garcia for identification to determine whether he was trespassing, but Becerra-Garcia did not speak English. Ranger Calabaza tried asking in Spanish. In response, Becerra-Garcia motioned toward the van, and Ranger Calabaza went to the van to retrieve Becerra-Garcia's identification. As Ranger Calabaza approached the van, he saw through the open door more than twenty undocumented aliens stuffed inside.

The rangers called the Tohono O'odham Police Department, and the police contacted the U.S. Border Patrol. At the direction of the police department, the rangers detained Becerra-Garcia and put him in the back seat of their jeep until the Border Patrol and tribal police officers arrived about thirty minutes later.

Becerra-Garcia was later charged with conspiring to transport illegal aliens and with transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). The district court denied Becerra-Garcia's motion to suppress the evidence of the illegal aliens. Becerra-Garcia then entered a conditional plea of guilty, preserving his right to appeal the denial of his motion to suppress.

## DISCUSSION

We review de novo a district court's denial of a motion to suppress. *United States v. Garcia*, 205 F.3d 1182, 1186 (9th Cir. 2000). We also review de novo whether an encounter between a police officer and an individual amounts to a seizure, *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997), and whether an investigatory stop was proper, *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1083-84 (9th Cir. 2000).

At issue in this appeal is the intersection of a tribal policy and the Fourth Amendment in the context of a motion to suppress evidence stemming from a traffic stop. Ironically, the parties each argue that the Fourth Amendment does not apply. Even more ironically, both are correct, but not for the reasons they offer.

Becerra-Garcia claims that the tribal officers were acting in a private capacity and therefore state law on citizen's arrest, not the Fourth Amendment, comes into play. The Government counters that Becerra-Garcia stopped voluntarily and thus there is no Fourth Amendment unreasonable seizure consideration. Both are wrong. The tribal officers were government agents, not private actors, and the stop was not voluntary. Yet the Fourth Amendment does not apply because the constitution does not directly apply to the conduct of tribal governments. Even so, a federal statute imposes precisely the same constraints on tribal governments as the Fourth Amendment, so Fourth Amendment law comes into play.

## I. THE APPLICABLE LAW

[1] At the outset, this case presents a thorny issue because the stop was made by tribal rangers on tribal land, although the arrest was made by federal officers. The wrinkle is that, while both parties have briefed this appeal as a Fourth Amendment case, the Fourth Amendment does not directly

govern the conduct of tribal governments. *United States v. Manuel*, 706 F.2d 908, 911 n.3 (9th Cir. 1983) (noting that the Fourth Amendment does not directly apply to Indian tribes) (citing *United States v. Wheeler*, 435 U.S. 313, 329 (1978)). Nonetheless, the Indian Civil Rights Act ("ICRA") imposes an "identical limitation" on tribal government conduct as the Fourth Amendment.[1] *Id.*; *see also United States v. Strong*, 778 F.2d 1393, 1397 (9th Cir. 1985). Thus, we analyze the reasonableness of the stop under well developed Fourth Amendment precedent, which nets the same result as an analysis under ICRA.

[2] We assume, as have courts before us, that suppression of evidence in a federal proceeding would be appropriate if the rangers' conduct violated ICRA. *See United States v. Male Juvenile*, 280 F.3d 1008, 1023 (9th Cir. 2002) (considering suppression of evidence based on argument that confession was wrongfully obtained by tribal investigators); *Strong*, 778 F.2d at 1396-97 (considering suppression of evidence based on argument that search violated ICRA); *Manuel*, 706 F.2d at 911-12 (considering suppression of evidence based on argument that arrest by tribal officers violated ICRA).[2]

Becerra-Garcia would have us avoid analyzing this appeal through the Fourth Amendment lens, not because the rangers are tribal officers, but because they acted in their capacity as

---

[1] The Indian Civil Rights Act (ICRA) provides that "No Indian tribe in exercising powers of self-government shall . . . violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures." 25 U.S.C. § 1302(2).

[2] We acknowledge that in the civil context, habeas corpus relief generally is the sole federal remedy for a violation of ICRA. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 69-70 (1978); *R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 981 (9th Cir. 1983). But this case does not rest on a claim under ICRA, only on the application of the "Fourth Amendment-like" standard imposed by ICRA. In the criminal context, suppression is a rule of federal criminal procedure rather than a civil remedy for an ICRA violation.

private citizens. Becerra-Garcia suggests that, because the tribal rangers lack the authority to stop cars, they were not acting in their capacity as government actors. Instead, he argues that citizen's arrest law, not the Fourth Amendment, controls the analysis. *See State v. Chavez*, 96 P.3d 1093, 1094 & n.1 (Az. Ct. App. 2004) (applying citizens' arrest framework to a stop conducted by tribal rangers for the San Xavier Indian Reservation). He further contends that there is no state law basis for a citizen's arrest in these circumstances.

**[3]** This approach, while creative, misses the mark. For Fourth Amendment purposes, an individual is a government agent if the government knew of and acquiesced in the officer's activities, and the party performing a seizure intended to assist law enforcement and did not act to further his own ends. *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994) (citing *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982)). Here, two different government entities — the Tohono O'odham Police Department and the Border Patrol — acknowledged and endorsed the patrol activities of the rangers. Indeed, the function of the rangers is to assist the tribal police department and Border Patrol by policing the remote corners of the reservation. The rangers stopped Becerra-Garcia to enforce the criminal trespass laws of the tribal nation, not to effect a personal benefit. Thus, because ICRA and the Fourth Amendment impose equivalent restrictions and because the rangers are government actors, we apply Fourth Amendment law to resolve this appeal.

## II.  THE STOP—A SEIZURE UNDER FOURTH AMENDMENT STANDARDS

The threshold question is whether there was a stop by the rangers or whether Becerra-Garcia voluntarily stopped his van. The government takes the position that the Fourth Amendment is not implicated because Becerra-Garcia stopped his van voluntarily, not as a result of government intrusion.

Becerra-Garcia testified that he stopped because the rangers flashed their emergency lights whereas the rangers claimed that they activated their lights only after the van had stopped. The district court weighed this conflicting testimony and sided with Becerra-Garcia, finding that the rangers effected a stop of the van.

We review the district court's factual findings for clear error, and we do not disturb those findings unless "they are without foundation." *United States v. Diaz-Cardenas*, 351 F.3d 404, 407 (9th Cir. 2003). We are especially reluctant to set aside a determination, such as this one, that depends wholly on a credibility finding. *United States v. Haswood*, 350 F.3d 1024, 1028 (9th Cir. 2003) (appellate court gives "special deference to the district court's credibility determinations"). Because the district court's conclusions are well grounded in the record, we accept the finding that the rangers stopped Becerra-Garcia. The stop falls squarely within the purview of the Fourth Amendment. *See United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002) (stating that "the Fourth Amendment's prohibition of unreasonable searches and seizures extends to [an] . . . investigatory stop of a vehicle"). Having determined that a stop occurred, we next analyze the reasonableness of that stop.

### III. REASONABLENESS OF THE STOP UNDER FOURTH AMENDMENT STANDARDS

The district court held that the rangers' suspicion of trespassing upon the Indian Nation justified the stop. Following the stop, the rangers detained Becerra-Garcia, conduct that fell squarely within their authority, and the Border Patrol made the actual arrest. Becerra-Garcia does not contest the finding with respect to reasonable suspicion. The sole argument he offers for why the stop was unreasonable is that the rangers lacked authority under tribal law to effectuate the stop.

Before we address Becerra-Garcia's argument, we take a detour to examine the authority of the Tohono O'odham rangers. Becerra-Garcia has not offered proof of any statute or regulation that circumscribes the rangers' powers. Instead, Becerra-Garcia relies entirely on testimony that the rangers had been told they lacked authority to stop vehicles. The source of this directive—whether statute, rule, fiat, or policy—was never explored. Despite the murkiness surrounding the scope and source of the rangers' powers, the evidence that the rangers lacked authority to stop drivers was uncontested. Consequently, for the purposes of this opinion, we assume that although the rangers had authority to detain individuals on the reservation, they were not authorized to stop Becerra-Garcia. We also consider the source of the limits on the rangers' authority—whatever it may be—to be the equivalent of tribal law. But, as we discuss below, the rangers' authority under tribal law is not the linchpin for determining the admissibility of the evidence obtained as a result of the stop.

### A. FRAMEWORK FOR ANALYSIS—FEDERAL LAW GOVERNS THE REASONABLENESS OF THE SEIZURE

**[4]** We start with the proposition that "[t]he general rule . . . is that evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment, and not in cases where it is tainted solely under state law." *United States v. Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000). We have extended this principle to the context of tribal law, holding that the admissibility of evidence in federal court is determined without regard to tribal law. *Male Juvenile*, 280 F.3d at 1023 ("[W]e reject the contention that tribal law should govern the admissibility of statements in federal court. Federal law governs federal proceedings."); *see also United States v. Hornbeck*, 118 F.3d 615, 617 (8th Cir. 1997) ("Federal, not tribal or state, law governs the admissibility of evidence" in the district court).

**[5]** For many years, we left unresolved the question whether state or federal law governed the reasonableness of seizures, *see, e.g.*, *United States v. Clawson*, 831 F.2d 909, 913 (9th Cir. 1987) (holding that the stop of a car was permissible regardless of whether state or federal law applied); *United States v. Contreras-Diaz*, 575 F.2d 740, 744 (9th Cir. 1978) (holding the federal and state tests to be the same), but we have now firmly come down on the side that the reasonableness of a seizure depends exclusively on federal law.³

In the oft-cited case of *United States v. Chavez-Vernaza*, 844 F.2d 1368 (9th Cir. 1987), we held that "evidence seized in compliance with federal law is admissible without regard to state law." *Id.* at 1374; *see also United States v. Bynum*, 362 F.3d 574, 582-83 (9th Cir. 2004). Of particular significance to the resolution of this case is the well-established proposition that an arrest in violation of state law may still be constitutionally reasonable. *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990) (no Fourth Amendment violation in § 1983 case when plaintiff arrested in violation of a state law). In *Barry*, we observed that "[w]hile Barry may have a remedy under state law, she has failed to allege a federal constitutional . . . violation." *Id.*⁴

---

³We have not deemed state law wholly irrelevant to Fourth Amendment analysis. Our precedent supports at least two exceptions to the principle that compliance with state law does not determine constitutional reasonableness, searches incident to arrest and inventory searches. *See Cormier*, 220 F.3d at 1111-12 (reasonableness of search incident to arrest depends on legality of arrest under state law and reasonableness of inventory search depends on compliance with state and local procedures). The stop of Becerra-Garcia does not fall under either of these exceptions, nor does the federal test for its validity incorporate state or tribal law. Becerra-Garcia was the subject of an investigatory traffic stop, the reasonableness of which depends only on reasonable suspicion, not on compliance with state or tribal law. *See Haynie v. County of Los Angeles*, 339 F.3d 1071, 1075 (9th Cir. 2003) (investigatory stops require only reasonable suspicion).

⁴We acknowledge some inconsistency in our cases on this broad issue. *See, e.g.*, *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 950 (9th

We note that the question of whether and how state law affects the constitutional reasonableness of a seizure has long troubled courts and has produced inconsistent results. *See Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004) (stating that the circuits are split on whether "an arresting officer's lack of authority under state or federal law to conduct an otherwise constitutionally valid arrest constitutes an unreasonable seizure under the Fourth Amendment"); *Jackson v. Louisiana*, 980 F.2d 1009, 1011 n.9 (5th Cir. 1993) (citing conflicting cases to show that whether the unauthorized use of police powers violates the Fourth Amendment is unresolved).

The weight of authority establishes that the test of whether a search or seizure violates the Fourth Amendment "is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Elkins v. United States*, 364 U.S. 206, 224 (1960); *see also Cooper v. California*, 386 U.S. 58, 61 (1967) (whether a search is reasonable under the Fourth Amendment is a different question than whether a seizure was authorized by state law). Accordingly, we and several of our sister circuits have declined to consider state law in determining the reasonableness of seizures. *See United States v. Bell*, 54 F.3d 502, 504 (8th Cir. 1995) ("[W]e do not think Fourth Amendment analysis requires reference to an arrest's legality under state law . . . . An arrest by state officers is reasonable in the Fourth Amendment sense if it is based on probable cause."); *Fields v. City of South Houston*, 922 F.2d 1183, 1189 (5th Cir. 1991) ("[A] civil rights action [under § 1983]

---

Cir. 2003) ("in evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest") (internal quotation marks omitted); *Pierce v. Multnomah County*, 76 F.3d 1032, 1041 (9th Cir. 1996) (holding, in a § 1983 case, that city policy that authorized officers to detain people for nonarrestable offenses violated state law and therefore violated the Fourth Amendment); *Reed v. Hoy*, 891 F.2d 1421, 1427 n.5 (9th Cir. 1990) (stating that state law is often relevant in analyzing the reasonableness of police conduct).

will not lie for a warrantless misdemeanor arrest in violation of state law."); *Chavez-Vernaza*, 844 F.2d at 1374 ("evidence seized in compliance with federal law is admissible without regard to state law"); *Street v. Surdyka*, 492 F.2d 368, 372 (4th Cir. 1974) ("Even if Officer Surdyka violated Maryland arrest law, he cannot be liable under section 1983 unless he also violated the federal constitutional law governing warrantless arrests.").

## B.   THE SEIZURE WAS REASONABLE

[6] Having established that, in this case, the legality of the seizure does not depend on the rangers' authority under tribal law, we turn to the question whether, under Fourth Amendment standards, the stop was reasonable. "The Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops." *Haynie v. County of Los Angeles*, 339 F.3d 1071, 1075 (9th Cir. 2003) (citation and internal quotations omitted). Because Becerra-Garcia did not challenge the district court's finding that the rangers had reasonable articulable suspicion to investigate for criminal trespass until his reply brief, we leave that finding undisturbed. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Notably, the scope of the rangers' intrusion was minimal: they merely turned their jeep around, followed the van, and turned on their emergency lights. Thus, the stop was reasonable.

Becerra-Garcia urges us to hold otherwise, suggesting that we adopt what, at bottom, is a bright-line rule for determining reasonableness: that a stop is automatically unreasonable if the officers lacked authority to conduct the seizure. The difficulty with this argument is that it seeks, in effect, to undo the general principle that federal law, not state or tribal law, governs the inquiry.

[7] The reasonableness of a seizure is generally analyzed on a case-by-case basis, not according to bright-line rules.

*See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 17, 20-21 (1968) (reject-ing a "rigid all-or-nothing model of justification and regula-tion under the [Fourth] Amendment" in favor of a flexible model that considers the scope of the intrusion and its justifi-cation); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931) ("There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances"). Following the longstanding principle that reasonableness cannot be reduced to *per se* rules, we have never held that a stop that exceeds an officer's tribal authority is automatically unreasonable. We decline to embrace Becerra-Garcia's sweeping rule because it runs counter to the flexible notion of reasonableness. The claim that the rangers lack specific tribal authority to stop vehicles does not trans-form this otherwise reasonable stop into an unreasonable one.

Our holding is consistent with our general recognition that Indian tribes are sovereigns with the power to enforce internal laws. *See, e.g.*, *United States v. Enas*, 255 F.3d 662, 666 (9th Cir. 2001) (en banc). Intrinsic in tribal sovereignty is the power to exclude trespassers from the reservation, a power that necessarily entails investigating potential trespassers. *See Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179-80 (9th Cir. 1975); *State v. Schmuck*, 121 Wash.2d 373, 381 (Wash. 1993) (relying on *Ortiz-Barraza* to hold that tribal authorities have the power to stop vehicles to investigate violations of tribal law). Holding that the minimally intrusive investigatory stop was reasonable evinces our respect for both the Fourth Amendment and tribal sovereignty.

**AFFIRMED.**